**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FOX ROTHSCHILD LLP**
49 Market Street
Morristown, NJ 07960
Telephone:  (973) 992-4800
Fax:  (973) 992-9125
Marc J. Gross
mgross@foxrothschild.com
Michael R. Herz
mherz@foxrothschild.com
Attorneys for Marc Lebovitz and Amy Lebovitz,
Creditors / Plaintiffs

|  |  |
|---|---|
| In Re:<br><br>DAVID GRIPPI,<br><br>          Debtor. | Chapter 11<br><br>Case No. 19-25628-KCF<br><br>Judge:  Hon. Kathryn C. Ferguson |
| MARC LEBOVITZ and AMY LEBOVITZ,<br><br>          Plaintiffs,<br><br>v.<br><br>DAVID GRIPPI<br><br>          Defendant. | Adv. Pro. No. 20-_____-KCF |

### COMPLAINT TO OBJECTING TO DISCHARGE AND TO DETERMINE NON-DISCHARGEABILITY OF DEBT

Plaintiffs Marc Lebovitz and Amy Lebovitz (together, the "Plaintiffs"), brings this

adversary proceeding complaint against debtor, David Grippi (the "Debtor" or the "Defendant"),

object to the Defendant's discharge and for a determination of the non-dischargeability of debt, and state as follows:

## JURISDICTION AND VENUE

1.      This adversary proceeding arises under 11 U.S.C. §§ 523(a)(2), (4), and (6), and 727(a)(3), (4), and (5), and Rules 4004 and 4007 of the Federal Rules of Bankruptcy Procedure.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

3.      This adversary proceeding is a core proceeding as that term is defined in 28 U.S.C. §§ 157(b)(2).

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

1.      Plaintiffs are husband and wife. They reside at 101-3 Ballantine Road, Bernardsville, New Jersey 07924.

2.      Defendant is in individual residing at 68 Wyckoff Street, # B, Matawan, New Jersey 07747.

3.      At all relevant times, the Defendant was the owner, officer, director, founder, member, manager, representative, and/or agent of Interglobal Construction, Inc. ("Interglobal Construction"), Interglobal Construction of NJ, Inc. ("Interglobal NJ"), and Interglobal Construction of NY, Inc. ("Interglobal NY" and collectively with Interglobal Construction and Interglobal NJ, "Interglobal"), and has controlled, directed, and/or participated in the management and operation Interglobal Construction, Interglobal NJ, and Interglobal NY.

4.      As the owner, officer, director, founder, member, manager, representative, and/or agent, the Defendant at all relevant times with in control of Interglobal and either directed or caused all conduct attributable to Interglobal in this Complaint.

5.      The Interglobal entities were customer home improvement contractors, builders, remodelers, and home renovators, that upon information and belief, operated as alter egos of each other.

## BANKRUPTCY PROCEDURAL HISTORY

6.      On August 13, 2019 (the "Petition Date"), the Defendant filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

7.      In his petition and schedules as originally filed on the Petition Date, the Defendant listed Interglobal Construction as a "DBA."

8.      In schedule A/B of his petition, the Defendant listed a 100% ownership interest in each of Interglobal Construction, Interglobal NJ, and Interglobal, NY, among other entities.

9.      In section 27 of the Statement of Financial Affairs annexed to the Debtor's petition, Interglobal NJ is listed as having been established on November 6, 2017 and as "not active," while Interglobal NY is listed has having been established on February 23, 2017, and also as "not active."

10.      On September 5, 2019, the Defendant filed an amended petition which removed the reference to Interglobal Construction as a "DBA."

11.      An initial meeting of creditors (the "First Creditors Meeting") pursuant to section 341(a) of the Bankruptcy Code was held on September 16, 2019, and was continued on January 15, 2020 (the "Continued Creditors Meeting").

12.     Plaintiffs are listed as creditors with an "unknown" claim amount at line 4.28 in schedule E/F of the Defendant's petition.

13.     On February 13, 2020, Plaintiffs filed an unsecured proof of claim for $714,750.96, designated as claim number 7.  As set forth in greater detail below, the claim is for (i) approximately $464,750.96 paid by Plaintiffs to the Defendant and Interglobal for renovations to the Plaintiffs home located at 21 Ocean Avenue, Monmouth Beach, New Jersey (the "Monmouth Beach Property"), that was never remitted by the Defendant and Interglobal to subcontractors on the project, resulting in some cases in subcontractors placing liens on the Property; and (ii) approximately $250,000.00 paid to a replacement general contractor, including to remediate work previously performed by the Defendant and Interglobal.

14.     Pursuant to a consent order entered on May 15, 2020, the deadline for the Plaintiffs to file a complaint objecting to the Defendant's discharge or determining the dischargeability of debt is July 15, 2020.

## FACTS AND ALLEGATIONS COMMON TO ALL COUNTS

**A.      The Contract for Renovations to Plaintiffs' Residence**

15.     Plaintiffs purchased the Monmouth Beach Property in July 2017 as a vacation home for their family.

16.     In or about January 2018, Plaintiffs began to solicit bids from home improvement contractors for the renovations to the Monmouth Beach Property.

17.     The Defendant, acting through Interglobal, induced Plaintiffs to enter into a contract (the "Contract") on or about October 8, 2018, for extensive renovations to the Monmouth Beach Property (the "Project").  A true and accurate copy of the Contract is attached as **Exhibit 1**.

18.     The name of the "contractor" listed in the Contract is "Interglobal Construction of NJ, Inc. / David Grippi, President, and Interglobal NJ appears in the heading of the front page of the Contract.

19.     The Contract set forth the price of $805,497.89, with an amount due of $241,164.96 (representing a fifteen percent "deposit" and fifteen percent "mobilization") due upon signing. See Exhibit 1.

20.     The Contract's scope of work provided for wide-ranging improvements to the Monmouth Beach Property that was broken down into categories of work, i.e, "Divisions," each with a corresponding cost:

- Division 01: General Requirements
- Division 02: Existing Conditions
- Division 03: Concrete
- Division 04: Masonry
- Division 04: Metal
- Division 06: Wood, Plastics & Composites
- Division 07: Thermal & Moisture Protection
- Division 08: Openings
- Division 09: Finishes
- Division 13: Special Construction
- Division 22: Plumbing
- Division 23: Heating, Ventilation and Air Conditioning
- Division 26: Electric
- Division 31: Sitework

See Exhibit 1.

21.     Under the Contract, the subtotal for the required work totaled $691,180.15.  The total price for the Project was $805,497.89, which included insurance ($6,220.62), overhead of five percent ($34,870.04), and profit of ten percent ($73,227.08).  See Exhibit 1 at p. 6.

22.     The Contract also provided that any alteration or deviation from the Contract's scope of work, involving extra costs for material or labor, would be executed upon written change order and would become an extra charge over and above the Contract price.  See Exhibit 1 at p. 7.

23.     The Defendant and Interglobal implicitly warranted, by operation of law that the work under the Contract would be of good workmanship, consistent with the standards of the industry, and free from defects.

24.     The Contract, however, contained a myriad of unlawful deficiencies that were in contravention of the regulations promulgated by the Attorney General under the New Jersey consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*, (the "NJ CFA"), including:

a.     The Contract failed to include Interglobal's (including Interglobal NJ's) "13VH" registration number with the New Jersey Division of Consumer Affairs.

b.     The Contact failed to include the informational statement and toll-free telephone number provided by the Director of the Division of Consumer Affairs making inquiries concerning home improvement contractors like Interglobal.

c.     The Contract failed to include any notice to Plaintiffs of their right to cancel the Contract for any reasons within three days of its execution.

d.     The Contract failed to include a copy of Interglobal's certificate of commercial general liability insurance or the telephone number of the insurance company issuing the certificate.

e.     The Contract failed to provide a date for the commencement or the completion of the work on the Project.

f.      The Contract failed to identify the brand, type, and quantity of material to be provided in connection with the Project.

g.      The Contract failed to include the terms and conditions affecting price, including the hourly rate for labor.

h.      The Contract failed to provide any payment schedule.

25.      By the time the Contract was provided to Plaintiffs by the Defendant, the Defendant and Interglobal had already begun work on the Project, and Plaintiffs had already made a $100,000 deposit against demolition, windows, shoring, framing, and other general conditions.

26.      On October 12, 2018, four days after the Contract was finalized, Plaintiffs made an additional payment to Interglobal in the amount of $196,542.10, representing the remaining amount due under the Contract, as well as a progress payment for work completed up to that point in time.

**B.      The Progress of the Project**

27.      Over approximately the next eight months, the Project progressed, albeit slowly.

28.      During the course of the Project, the Defendant included certain "Additions to Contract" (hereinafter, "Change Orders"), that increased the price of the Project, but nearly all of the Defendant's Change Orders failed to include a signature from either of the Plaintiffs.

29.      In all, between November 8, 2018 and June 5, 2019, forty-seven Change Orders were added to the Project, at a total cost of $546,332.14. Through the Change Orders, the Defendant sought to increase the cost of the Project by nearly $550,000.00 from $804,798.55 to $1,351,130.69.

30.    Over the course of the Project, the Defendant submitted eight separate documents, each entitled "Application and Certificate for Payment" (collectively, the "Payment Applications"). Each of the Payment Applications reflected (a) the original Contract price, (b) the net change in the Contract Price due to Change Orders on the Project, (c) the total Contract sum (original sum plus Change Orders), (d) the cost of total completed and stored work to date, (e) amounts paid or otherwise credited to Plaintiffs, and (f) the remaining cost to complete the Project.

31.    A summary of the Payment Applications is as follows:

| App. No. | Date | Original Contract Sum | Change Orders Sum | Total Contract Sum | Completed & Stored Work to Date | Amounts Paid by Pls. | Cost to Complete Project |
|---|---|---|---|---|---|---|---|
| 2 | Oct. 8, 2018 | $805,497.89 | $0 | $805,497.89 | $296,542.10 | $296,542.10 | $508,955.79 |
| 3 | Nov. 28, 2018 | $804,798.55 | $7,656.26 | $812,454.81 | $408,144.41 | $408,144.41 | $404,310.40 |
| 4 | Jan. 15, 2019 | $804,798.55 | $93,511.67 | $898,310.22 | $537,116.82 | $537,116.82 | $361,193.40 |
| 5 | Feb. 20, 2019 | $804,798.55 | $353,856.83 | $1,158,655.38 | $716,863.31 | $716,863.31 | $441,792.07 |
| 6 | Mar. 22, 2019 | $804,798.55 | $391,496.59 | $1,196,295.14 | $776,982.49 | $776,982.49 | $419,312.65 |
| 7 | Apr. 11, 2019 | $804,798.55 | $399,227.22 | $1,204,025.77 | $938,071.98 | $938,071.89 | $265,953.79 |
| 8 | April 29, 2019 | $804,798.55 | $476,242.05 | $1,281,040.60 | $1,054,229.82 | $1,054,229.82 | $226,810.78 |
| 9 | June 5, 2019 | $804,798.55 | $546,332.14 | $1,351,130.69 | $1,214,992.08 | $1,214,992.08 | $136,138,61 |

32.    By submitting these Payment Applications, the Defendant represented to Plaintiffs, among other things, the running total cost of the Project (including the original Contract price plus all Change Orders) and the remaining cost to complete the Project.

33.    Relying on the contents of these Payment Applications, and the progress they reflected, Plaintiffs promptly made payment after their receipt thereof (and of Interglobal's corresponding invoices).

34.    All told, Plaintiffs made payments to the Defendant and Interglobal totaling approximately $1.2 million.

**C.    Defendant Misrepresented That the Project Was Nearly Ninety-Percent Complete**

35.    When the Defendant submitted Payment Application No. 9 on or around June 5, 2019, the Defendant explicitly represented that the remaining balance to complete the Project was $136,138.61.  A true and accurate copy of the June 5, 2019 Payment Application is attached as **Exhibit 2**.  The June 5, 2019 Payment Application also confirmed that Plaintiffs had paid for $1,197,621.98 of the $1,351,130.69 (i.e., 88.6 percent) of the total cost of the Project.

**D.    Plaintiffs Learn of Failure to Pay Subcontractors**

36.    Around this time, in late June and early July 2019, work on the Project became increasingly delayed, if not halted.

37.    Soon after, in mid-July 2019, the Defendant and Interglobal unlawfully terminated their performance under the Contract and ceased all work. Plaintiffs confirmed the voluntary cessation of work in an e-mail dated July 12, 2019, a true and accurate copy of which is attached as **Exhibit 3**.

38.    Soon, thereafter, Plaintiffs became aware that that the Defendant and Integlobal had absconded with a substantial portion of the money that Plaintiffs had paid them.

39.    Plaintiffs also learned that the Defendant and Interglobal had failed to pay subcontractors for completed and/or prospective contracted-for home improvement work.

40.    Indeed, the Defendant and Interglobal failed to make payment to the subcontractors despite the fact that Plaintiffs had made all required payments to the Defendant and Interglobal under the Contract.

41.     The failure of the Defendant and Interglobal to pay the subcontractors resulted in work on the Project being delayed, put off, or stopped all-together, as subcontractors refused to commence or continue contracted-for work until they received payment.  As set forth in greater detail below, the failure of the Defendant and Interglobal to pay subcontractors also resulted in subcontractors filing liens against the Monmouth Beach Property, as well as Plaintiffs' receipt of unexpected bills from subcontractors.

42.     On July 12, 2019, in response to Plaintiffs' inquiries, the Defendant provided Plaintiffs with a QuickBooks printout entitled "Job Costs by Job and Vendor Detail" (the "Project Report"). The Project Report illustrated: (a) all amounts billed by subcontractors who had performed contracted-for work on the Project; and (b) an amount paid by Interglobal to the subcontractors for such work.  A true and accurate copy of the Project Report is attached as **Exhibit 4**.

43.     Surprisingly, the Project Report showed a massive outstanding balance of at least $464,750.96 to the subcontractors from the Defendant and Interglobal (See Exhibit 4, page 8). Thus, it became clear that rather than pay the subcontractors on the Project, as they were obligated to do, the Defendant and Interglobal had instead absconded with and/or otherwise misappropriated the amounts paid to them by Plaintiffs.

44.     Worse still, Plaintiffs' review of the Project Report revealed that the report likely drastically understated the actual amounts due to the subcontractors, because it failed to include certain subcontractors who had performed work, including, for example, Classic Door Co., LLC.

45.     In mid-July 2019, the Defendant admitted that neither he nor Interglobal had sufficient funds to pay the outstanding balance due to the subcontractors and that he was

essentially out of business, offering no explanation as to what had happened to the monies

Plaintiffs had paid to him.

46.     Instead, the Defendant sent Plaintiffs the following text message, apologizing:

"So to say I sorry is not enough.I meet with my lawyers because we did AIA billing and you paid me wish is reflected by line items .You can not pay 2x .If someone liens lumber companies or vendors ,It comes back to me .Not you .The courts will remove the lien .A person CAN NOT pay 2x it come back to me .Again I know it means nothing but ai am sorry at least you are not liable."

A true and accurate copy of the Defendant's text message is annexed as **Exhibit 5**.

47.     It cannot be disputed that the Defendant's own records demonstrate that he and

Interglobal failed to pay subcontractors and absconded with Plaintiffs' funds.  In this regard, for

instance, the Defendant and Interglobal failed to pay Garden State Roofing & Siding ("GS

Roofing"), a roofing subcontractor.

48.     With respect to GS Roofing, the Defendant presented a contracted amount of

$168,953.00 for GS Roofing's work.  As is clear from the June 5, 2019 Payment Application,

Plaintiffs paid Interglobal the amount of $154,507.70 -- representing 90 percent of the cost for

GS Roofing's work -- with $14,445.30 remaining to be paid once the work was completed.  See

Exhibit 2, Item Nos. 19-20.

49.     The Defendant and Interglobal's internal Project Report, however, shows that, as

of July 10, 2019, the Defendant and Interglobal had only paid GS Roofing a total of $65,000 --

nearly $90,000 less than what Plaintiffs paid to the Defendant and Interglobal toward this work.

See Exhibit 4, pp. 4-5.

50.     Thus, whereas the Defendant represented to Plaintiffs that only $14,445.30 was

remaining for the work to be completed by GS Roofing (see Exhibit 2, Item Nos. 19-20), the

Project Report showed that, in reality, $103,953.00 remained due and owing to GS Roofing.  <u>See</u> Exhibit 4, p. 5.

51.    In another example, the Defendant presented Plaintiffs a contracted amount of $119,058.66 for work to be performed by Woodhaven Lumber & Millword ("<u>Woodhaven</u>").  <u>See</u> Exhibit 2, Item Nos. 22-23, 65 & 82

52.    As the June 5, 2019 Payment Application shows, Plaintiffs paid Interglobal the sum of $119,058 for these four items, representing payment in full with no balance outstanding. <u>See</u> <u>ibid.</u>

53.    The Defendant and Interglobal's internal Project Report, however, shows that Interglobal only paid Woodhaven $10,000 of the $119,058.66 paid by Plaintiffs to Interglobal toward this work. <u>See</u> Exhibit 4, pp. 7-8.

54.    Thus, whereas the Defendant represented to Plaintiffs that there was no outstanding balance with respect to Woodhaven (<u>see</u> Exhibit 2, Item Nos. 22-23, 65 & 82), the Project Report showed that, in reality, $123,830.59 remained due and owing to Woodhaven.  <u>See</u> Exhibit 4, pp. 7-8.

55.    In addition, the Project Report demonstrates that the invoice accrual totaled $133,830.59 for Woodhaven, which amount is $14,771.93 over and above what Interglobal had represented the sums to be in the Contract and in the Payment Applications.

56.    Unquestionably, Plaintiffs were duped by the Defendant's fraud and relied upon his material misrepresentations in the Payment Applications, when they paid him and Interglobal approximately $1.2 million, including vast amounts that were earmarked for subcontractors, but were never paid by the Defendant and Interglobal to subcontractors despite prior representations by the Defendant to Plaintiffs that no balances were due to subcontractors.

57.     As set forth above, the Defendant made clear that neither he nor Interglobal had sufficient funds to satisfy the outstanding balance owed to subcontractors for contracted-for work, notwithstanding the fact that Plaintiffs had already made payments to the Defendant and Interglobal earmarked for these subcontractors and paid sums more than sufficient to cover the costs, especially when considering that these payments included Interglobal's overhead and profit margins.

58.     Based upon the Defendant's representations, it was Plaintiffs' reasonable understanding that the total value of work that was to be performed through subcontractors was $1,150,787.29, which amount included work within the original scope of the Contract plus all Change Orders. The Project Report, however, only shows a total amount of $948,962.51 for subcontracted work.  Thus, the Defendant and Interglobal failed to account for an additional $201,824.78 of work, included in their line items, but paid for by Plaintiffs.

59.     Further, the Project Report shows that only $484,211.55 of the $948,962.51 in subcontracted work was paid by the Defendant and Interglobal to the subcontractors, leaving a balance of $464,750.96 outstanding.  See Exhibit 4, page 8.

60.     In stark contrast, just one month prior to providing the Plaintiffs with the Project Report, the Defendant and Interglobal represented in the June 5, 2019 Payment Application that only $136,138.61 remained outstanding to completely finish the Project.

61.     The outstanding balance of $464,750.96, as reflected in the Project Report, is comprised of amounts due to the subcontractors as follows:

|   | Subcontractor | Amount Due |
|---|---|---|
| 1 | AM PM Plumbing & Heating Services Inc. | $8,665.00 |
| 2 | Artistic Railing, Inc. | $69,840.00 |
| 3 | Baker Lighting Rod Co., LLC | $6,887.50 |
| 4 | Balanced Climate | $11,1150.00 |
| 5 | Blue Line Drywall & Insulation | $40,000.00 |

| 6 | Builders' General Supply Company | $14,896.80 |
| 7 | Creative Wood Products, Inc. | $1,536.00 |
| 8 | Dreyer's Lumber & Hardware | $3,765.49 |
| 9 | East Coast Energy Products | $3,638.96 |
| 10 | Enhancement (Central Vac) Systems, LLC | $1,447.50 |
| 11 | Garden State Roofing & Construction | $103,953.00 |
| 12 | Gomez Painting & Finishing, LLC | $25,400.00 |
| 13 | Green Valley Concrete, LLC | $4,156.00 |
| 14 | Home Depot | $29.92 |
| 15 | Johnny On The Spot | $161.02 |
| 16 | Maranatha Stairs & Rails | $10,750.00 |
| 17 | Premier Electric, LLC | $17,457.95 |
| 18 | Robert A. Hazelrigg | $252.00 |
| 19 | Sakoutis Brothers Disposal, Inc. | $1,994.63 |
| 20 | Service Management Installation, Inc. | $14,965.00 |
| 21 | Supplies Master, Inc. | $18.60 |
| 22 | Woodhaven Lumber | $123,830.59 |
| | **TOTAL** | **$464,750.96** |

62.     This list, however, is not exhaustive and otherwise inaccurate, as it fails to include additional subcontractors that performed work on the Project.

63.     Due to the Defendant and Interglobal's failure to pay the subcontractors in connection with their work on the Project, the subcontractors did not perform and/or did not complete their work.  Worse, still, the Defendant stated that he and Interglobal were unable to pay these subcontractors, despite Plaintiffs' having paid the Defendant and Interglobal for this work.

As a result, Plaintiffs have so far been forced to pay an additional approximately $250,000.00 for subcontracted work that was included in the Contract and/or already paid for by Plaintiffs in order to have certain work completed, as well as to have certain deficient work performed by the Defendant and Interglobal remediated.[1]

---

[1] The work remains ongoing and costs will continue to increase.

64.     Additionally, due to the Defendant and Interglobal's failure to pay subcontractors, the Monmouth Beach Property was exposed to subcontractors recording liens and other encumbrances that would cloud Plaintiffs' title.

65.     Indeed, since the Defendant and Interglobal unlawfully terminated the Contract, Plaintiffs have been advised of two liens that have been filed against the Property by:

a.     Woodhaven in the amount of $119,920.97; and

b.     Builders' General Supply in the amount of $7,644.97.

66.     Plaintiffs have incurred costs in attempting to remove liens placed on subcontractors on the Monmouth Beach Property for amounts paid by the Plaintiffs to the Defendant and Interglobal but which amounts were never remitted by the Defendant and Interglobal to subcontractors, including in litigation with Woodhaven.[2]

67.     Additionally, Plaintiffs have learned that the Defendant and Interglobal simultaneously: (a) inflated Change Orders beyond the amounts actually quoted by some subcontractors; and (b) agreed to unauthorized Change Orders with other subcontractors.

68.     All told, the Defendant and Interglobal left the Project incomplete and the Monmouth Beach Property uninhabitable, while absconding with hundreds of thousands of dollars paid by the Plaintiffs that were earmarked for subcontractors.

69.     Based upon the condition of Plaintiffs' home, money designated to complete the Project under the Contract will be insufficient and Plaintiffs are required to expend additional sums, over and above the amounts set forth in the Contract to complete the Project.

70.     As a result of the Defendant's unlawful, fraudulent, and intentional conduct, individually and through Interglobal, Plaintiffs have suffered and continue to suffer irreparable

---

[2] *See Woodhaven Lumber & Millwork, Inc. v. Marc Lebovitz, et al.*, Superior Court of New Jersey, Monmouth County, Docket No.:  MON-L-3883-19.

harm and have been deprived of the use and enjoyment of their home, defrauded out of a sum in

excess of one million dollars, had the title to their home clouded and will have to incur, in the

future, additional expenses to complete and correct the Defendant and Interglobal's work.

**E.     Defendant Misrepresents that Interglobal Is Out of Business**

71.     On August 22, 2019, Plaintiffs received a letter from Robert T. Lawless, Esq. on

behalf of the Defendant.  The letter stated, among other things, that the Defendant "has asked

that [Mr. Lawless] advise [the Lebovitzes] that Interglobal Construction is no longer in

business."  A true and accurate copy of this August 22, 2019 correspondence is attached as

**Exhibit 6**.

72.     At about the same time, however, the Defendant inadvertently sent the following

text message to Mrs. Lebovitz

> **Hi good morning , how did it go at the meeting on Sunday.Was our price where you expected it .Thank you David**

A true and accurate copy of the Defendant's August 19, 2019 text message in this regard is

annexed as **Exhibit 7**.

73.     The text message confirms that the Defendant continued to operate his

construction business, either individually, through Interglobal, or through some other sham

entity, after unlawfully terminating the Contract and representing to Plaintiffs that he ceased

operation.

**F.     The Defendant's Abuse of the Corporate Form**

74.     The Defendant utilized the Interglobal entities as shells for the primary purpose of

committing a fraud or injustice, including the intentional misappropriation of sums paid by

Plaintiffs and the fraudulent inducement of certain subcontractors to perform work.

75.    For example, although the Contract identifies Interglobal NJ as the home improvement contractor:

<ol type="a">
<li>all of the invoices were not from Interglobal NJ, but were from Interglobal Construction;</li>
<li>all Change Orders were from Interglobal Construction, not Interglobal NJ;</li>
<li>all checks used by Interglobal to make payments to subcontractors were Interglobal Construction checks and drawn on Interglobal Construction accounts;</li>
<li>Plaintiffs' wire transfers were made not to Interglobal NJ, but into Interglobal Construction account; and</li>
<li>Interglobal's website references only Interglobal Construction without any reference whatsoever to Interglobal NJ.</li>
</ol>

76.    The foregoing illustrates that the Defendant, as the principal of Interglobal Construction and Interglobal NJ, failed to operate his entities with the typical corporate formalities, utilized the entities interchangeably and as alter egos of himself and each other.

77.    As noted above, the Defendant's petition indicates that he is the sole owner of both Interglobal Construction and Interglobal NJ, and exercises controlling influence over each of them.

**G.    Meeting of Creditors Testimony**

78.    During the First Creditor Meeting, the Defendant testified that monies paid by the Plaintiffs that should have been earmarked for subcontractors on Plaintiffs' Project, was instead used to pay for projects in New York.  As noted above, the Defendant and Interglobal's failure to pay subcontractors on the Project resulted in subcontractors recording liens on the Monmouth Beach Property.

79.    During the Continued Creditors Meeting, the Defendant testified that the Interglobal entities were essentially operated as one business, with a single bank account.

17

80.     The Defendant further testified at the Continued Creditors Meeting that Interglobal NJ and Interglobal NY were "never really activated."  However, as noted above and reflected in Exhibit 1 hereto, the Interglobal entity identified in the Contract for Plaintiffs' Project was Interglobal NJ.

81.     The Defendant also confirmed at the Continued Creditors Meeting that the Plaintiffs remitted to the Defendant and Interglobal the full contracted $119,058.66 for work performed by Woodhaven.

## COUNT ONE
### (Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A))

82.     Plaintiffs repeat all of the allegations contained in the previous paragraphs of this Complaint as if same were fully set forth herein.

83.     As set forth above, at all relevant times the Defendant was the 100% owner and in control of Interglobal.

84.     The NJ CFA prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, . . .

N.J.S.A. 56:8-2

85.     The NJ CFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-l(c).

86.    At all relevant times, the Defendant through Interglobal was engaged in the advertisement and sale of merchandise within the meaning of N.J.S.A. 56:8-l(c), including, but not limited to, home improvement and renovation services.

87.    As set forth above, the Defendant engaged in unconscionable commercial practices and acts of deception, including affirmative misrepresentations and knowing omissions with respect to the Contract and the Project, by:

a.  Providing contracts after home improvement work had commenced;

b.  Failing to pay subcontractors, despite having received payment from Plaintiffs that was to be specifically allocated to such subcontractors;

c.  Submitting false Payment Applications to Plaintiffs, through which the Defendant and Interglobal represented to Plaintiffs that only $136,138.61 in costs remained to complete the Project, when in reality the Defendant and Interglobal failed to pay to pay subcontractors at least $464,750.96 of the approximately $1.2 million paid by the Plaintiffs to the Defendant and Interglobal.

d.  Omitting and concealing from Plaintiffs that Defendants had failed to make payments to subcontractors, as they were required to do;

e.  Omitting and concealing from Plaintiffs that the Defendant and Interglobal would be unable to make payments to these subcontractors, despite Plaintiffs having made payment to Interglobal for these costs;

f.  Commencing home improvement work and then abandoning the Project totally;

g.  Taking Plaintiffs' payments and then failing to provide the contracted-for home improvements;

h. Failing to perform home improvement work according to the Contract specifications and demanding and receiving payment for the work; and

i. Refusing to issue a refund when so requested by Plaintiffs after Defendants failed to perform the contracted-for home improvement work; and

j. Inflating Change Orders beyond the amounts actually quoted by some subcontractors and agreeing to unauthorized Change Orders with other subcontractors.

88.     In connection with the Project and the Contract, the Defendant engaged in the foregoing unconscionable commercial practices, deception, fraud, false pretenses, false promises, and misrepresentations, and knowingly concealed, suppressed, or omitted material fact with intent that Plaintiffs rely upon such concealment, suppression or omissions.

89.     Plaintiffs have been damaged and suffered ascertainable loss as a result of the foregoing conduct on the part of the Defendant.

90.     In addition, the Defendant and Interglobal violated numerous statues and/or regulations promulgated in connection with the NJ CFA, including the Contractors' Registration Act ("NJ CRA"), N.J.S.A. 56:8-136, *et seq*. and associated regulations.

91.     Enacted in 2004, the NJ CRA supplements the CFA by imposing a number of disclosure obligations on contractors in order to guarantee that even the most inexperienced consumer is informed of his or her rights. Many of the NJ CRA's provisions are enforced through administrative regulations applicable to home improvement practices, N.J.A.C. 13:45A-16.1 to 16.2, and home improvement contractor registration, N.J.A.C. 13:45A-17.1 to 17.14.

92.     Failure to comply with the NJ CRA's provisions and implementing regulations constitutes a violation of the NJ CFA.  N.J.S.A. 56:8-146(a).

93.     "Residential or non-commercial property" is defined at N.J.A.C. 13:45A-16.1A as "a structure used, in whole or in substantial part, as a home or place of residence by any natural person . . . ."

94.     The Plaintiffs' residence on the Property is a single-family home and is a residential property within the meaning of the CFA.

95.     A "[h]ome improvement contract" is defined at N.J.A.C. 13:45A-16.1A as "an oral or written agreement between a seller and an owner of residential or noncommercial property, . . . and includes all agreements under which the seller is to perform labor or render services for home improvements, or furnish materials in connection therewith."

96.     The Contract is a home improvement contract within the meaning of the NJ CFA.

97.     A "home improvement" is defined at N.J.A.C. 13:45A-16.1A as "the remodeling, altering, painting, repairing, renovating, restoring, moving, demolishing, or modernizing of residential or noncommercial property . . . . "  The work to be performed as part of the Project and pursuant to the terms of the Contract constitutes a home improvement within the meaning of the CFA.

98.     A "Seller" is defined at N.J.A.C. 13:45A-16.1A as "a person engaged in the business of making or selling home improvements and includes corporations, partnerships, associations and any other form of business organization or entity, and their officers, representatives, agents and employees."

99.     The Defendant and the Interglobal entities are all sellers within the meaning of the NJ CFA.

100.    With the foregoing statutory and regulatory framework in mind, the Defendant, either individually or through Interglobal, committed the following acts of consumer fraud:

a.    N.J.A.C. 13:45A-16.2(a)(12) requires that all home improvement contracts, and all changes in the terms and conditions thereof, shall be signed by all parties thereto.  The Contract, however, was not signed by Plaintiffs, the Defendant, or Interglobal.

b.    N.J.S.A. 56:8-144 requires all that all contracts with consumers of home improvement services shall display the contractor's registration numbers with the Division of Consumer Affairs.  The Contract, however, did not provide Interglobal NJ or Interglobal's registration number with the Division of Consumer Affairs.

c.    N.J.A.C. 13:45A-17A.10(f) provides: "Any invoice, contract, or correspondence given by a registrant to a consumer shall prominently contain the toll-free telephone number provided by the Division pursuant to N.J.S.A. 56:8-149.b, which shall be displayed in all caps in at least 10-point boldface type as follows: FOR INFORMATION ABOUT CONTRACTORS AND THE CONTRACTORS' REGISTRATION ACT, CONTACT THE NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF CONSUMER AFFAIRS AT 1-888-656-6225." The Contract, however, did not include this information.

d.    N.J.S.A. 56:8-151(a)(2) requires that a home improvement contractor annex a copy of the contractor's certificate of general liability insurance to the home improvement contract.  The Contract, however, did not include a copy of Interglobal NJ or Interglobal's certificate of general liability.

e.    N.J.S.A. 56:8-151(b) requires that a home improvement contract provide the consumer with "a conspicuous notice" advising the consumer (a) of its right to cancel the contract at any time before midnight of the third business day after receiving a copy

of the contract by sending a signed and dated written notice of cancellation by registered or certified mail or personally delivering a signed and dated written notice of cancellation to a designated representative of the contractor, and (b) in the event that the consumer exercises its right to cancel within the three-day period, then the consumer is entitled to a full refund of money paid to the contractor within 30 days of receipt of the cancellation notice.  The Contract, however, did not provide Plaintiffs with this required notice regarding Plaintiffs' cancellation rights.

f.        N.J.A.C. 13:45A-16.2(a)(12)(iii) provides that it is unlawful under the NJ CFA for a home improvement contract to fail to set forth the total price or other consideration to be paid by the buyer, including the hourly rate for labor and all other terms and conditions of the contract affecting price.  The Contract, however, did not set forth, among other things, the hourly rate for labor and/or other terms and conditions of the Contract affecting price.

g.        N.J.A.C. 13:45A-16.2(a)(7)(iii) and (a)(12)(iv) provide that it is unlawful under the CFA for a home improvement contract to fail to set forth the date that the work will begin.  The Contract, however, did not set forth the date that the work on the Project was to begin.

h.        N.J.A.C. 13:45A-16.2(a)(7)(iii) and (a)(12)(iv) provides that it is unlawful under the CFA for a home improvement contract to fail to set forth the date that the work will be completed.  The Contract, however, did not set forth the date that the work on the Project was to be completed.

i.        N.J.A.C. 13:45A-16.2(a)(12)(ii) provides that a home improvement contact shall describe "the name, make, size, capacity, model, and model year of

principal products or fixtures to be installed, and the type, grade, quality, size or quantity

of principal building or construction materials to be used." The Contract, however, did

not set forth the name, make, size, capacity, model, and model year of principal products

or fixtures to be installed, or the type, grade, quality, size or quantity of principal building

or construction materials to be used.

101.    In addition to the foregoing acts of consumer fraud, the Defendant intentionally

made material representations that he knew or should have known were false when made. More

particularly, as set forth above, the Defendant misrepresented certain facts to the Plaintiffs,

including, but not limited to, the statements in the Payment Applications as to the outstanding

balance remaining to complete the Project, as well as statements that the Defendant and

Interglobal would pay (or had paid) the subcontractors on the Project.

102.    Plaintiffs reasonably and justifiably relied on these material promises and

representations, resulting in direct financial harm to the Plaintiffs, including, but not limited to (i)

paying approximately $1.2 million to the Defendant and Interglobal, including at least

$464,750.96 that was earmarked for subcontractors but that was not tendered by the Defendant

and Interglobal to subcontractors, and which, according to the Defendant's testimony at the First

Creditors Meeting, was instead siphoned to unrelated projects in New York; (ii) the recording of

liens by subcontractors against the Monmouth Beach Property; (iii) paying thus far

approximately $250,000.00 in hiring replacement contractors to complete and remediate the

Defendant and Interglobal's work; and (iv) payment of legal fees and costs to address liens

recorded by subcontractors.

103.    Further, as detailed, there are several questions about the Defendant's use of the

corporate form. For instance, based on the Contract, Plaintiffs believed they were dealing with

Interglobal NJ, an entity that the Defendant testified at the Continued Creditors Meeting was "never really activated," and as noted, payments made by Plaintiffs earmarked for subcontractors on the Project were used by the Defendant to pay for projects in New York despite Defendant representing to Plaintiffs that subcontractors on the Project had been near fully paid.

104.    Based on the foregoing, the Defendant obtained substantial money from Plaintiffs through false pretense, false representations, and/or actual fraud.

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows:

A.    Determining the Plaintiffs' claim (including damages) against Defendant is a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(2)(A);

B.    Awarding attorneys' fees and costs; and

C.    For such other and further relief as the Court deems just and proper.

## COUNT TWO
### (Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4))

105.    Plaintiffs repeat all of the allegations contained in the previous paragraphs of this Complaint as if same were fully set forth herein.

106.    As sole owner, principal, and president of the Interglobal entities, the Defendant was at all relevant times placed in a fiduciary relationship and owes a fiduciary duty to Plaintiffs and to all other creditors.

107.    The Defendant breached his fiduciary duty to Plaintiffs and to Interglobal in a multitude of ways set forth in greater detail above, including through (i) abuse of the corporate form; (ii) committing consumer fraud in violation of a variety of statutes and regulations in order to induce payment from the Plaintiffs; (iii) making materially false promises and representations to Plaintiffs in order to induce payment, the Plaintiffs reliance upon which proximately resulted in further damages, including in addressing liens recorded by subcontractors against the

Monmouth Beach Property, and paying additional sums to complete and remediate the work of the Defendant and Interglobal; (iv) making materially false representations, including in the Payment Applications, regarding the outstanding balance to complete the Project and making false promises and representations that subcontractors have or will be paid; and (v) misappropriating monies paid by Plaintiffs earmarked for subcontractors on Plaintiffs' Project to projects in New York.

108.    With respect to payments made by Plaintiffs to the Defendant and Interglobal for subcontractors, such funds were to be held in trust by the Defendant for payment to the subcontractors.  The Defendant therefore failed to honor his fiduciary obligation when failing to pay subcontractors, including in misappropriating such funds for projects in New York.  The Defendant's breach of fiduciary duty was all the more egregious by his misrepresentations to Plaintiffs, including the Payment Applications, regarding the outstanding balance to complete the Project.

109.    All told, the Defendant either directly or through Interglobal unlawfully exercised dominion and control over Plaintiffs' assets, and specifically the sums paid by Plaintiffs to Defendants, which were not utilized to pay the subcontractors, effectively constituting conversion.

110.    Based on the foregoing conduct, the Defendant committed fraud or defalcation while acting in a fiduciary capacity.

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows:

A.    Determining the Plaintiffs' claim (including damages) against Defendant is a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(4);

B.    Awarding attorneys' fees and costs; and

C.    For such other and further relief as the Court deems just and proper.

## COUNT THREE
### (Non-Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6))

111.    Plaintiffs repeat all of the allegations contained in the previous paragraphs of this Complaint as if same were fully set forth herein.

112.    The Defendant's conduct, as detailed above, caused willful and malicious injury to the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows

    A.    Determining the Plaintiffs' claim (including damages) against Defendant is a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(6);

    B.    Awarding attorneys' fees and costs;

    C.    For such other and further relief as the Court deems just and proper.

## COUNT FOUR
### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(3))

113.    Plaintiffs repeat all of the allegations contained in the previous paragraphs of this Complaint as if same were fully set forth herein.

114.    As noted, the Debtor has not provided any documentation demonstrating the disposition of the nearly $1.2 million paid by the Plaintiffs on the Project, including the at least $464,750.96 that was never remitted to subcontractors, as well as the extent that were misappropriated for other uses, including for projects in New York.  These are substantial funds that must be accounted for in connection with the Debtor's bankruptcy case.

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows:

    A.    Denying the Defendant's discharge pursuant to 11 U.S.C. § 727(a)(3).

    B.    Awarding attorneys' fees and costs; and

    C.    For such other and further relief as the Court deems just and proper.

## <u>COUNT FIVE</u>
### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(4))

115.    Plaintiffs repeat all of the allegations contained in the previous paragraphs of this Complaint as if same were fully set forth herein.

116.    As set forth above, the Contract failed to include various information and disclosure required under state law and regulations.

117.    As further set forth above, Plaintiffs believed they were transacting with Interglobal NJ, when in fact such company was "never really activated."

118.    As further set forth above, the Defendant made false representations to Plaintiffs regarding the outstanding balance of work to be completed, as reflected in the Payment Applications, and that subcontractors had largely ben or would be paid.

119.    All told, the Defendant knowingly and fraudulently made false accounts and/or presented or used false claims in order to induce Plaintiffs to pay the Defendant and Interglobal approximately $1.2 million dollars.

120.    Indeed, Defendant utilized false and accounts and presentations to induce Plaintiffs to continue to spend additional amounts on the Project above the original amount in the Contract, despite the fact that subcontractors were not being paid and the Project and was not being completed, resulting in Plaintiffs having exposure to liens from subcontractors and having to incur further costs in completing the Project and remediating the Defendant and Interglobal's work.

121.    Through his conduct, the Defendant knowingly and fraudulently obtained money from Plaintiffs in return for promises to act (i.e. complete the Project and pay subcontractors).

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows:

  A. Denying the Defendant's discharge pursuant to 11 U.S.C. § 727(a)(4)(A), (B), and (C).

  B. Awarding attorneys' fees and costs; and

  C. For such other and further relief as the Court deems just and proper.

### COUNT SIX
### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(5))

122. Plaintiffs repeat all of the allegations contained in the previous paragraphs of this Complaint as if same were fully set forth herein.

123. Plaintiffs paid the Defendant and Interglobal approximately $1.2 million in connection with the Project. Of that amount, at least $464,750.96 was never paid by the Defendant and Interglobal to subcontractors.

124. As noted, the Defendant testified at the First Creditor Meeting that the monies paid by Plaintiff were applied to projects in New York rather than paying subcontractors on Plaintiffs' project.

125. The actual disposition of the funds paid by Plaintiffs to the Defendant and Interglobal, which is a significant amount, has not actually been accounted for by Defendant.

126. The Defendant's undocumented misappropriation of payments by the Plaintiffs has directly resulted in the Defendant having substantial liability to the Plaintiffs.

127. The Defendant has consequently failed to explain satisfactorily the loss or deficiency of assets to meet his liabilities.

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows:

  A. Denying the Defendant's discharge pursuant to 11 U.S.C. § 727(a)(5);

  B. Awarding attorneys' fees and costs; and

  C. For such other and further relief as the Court deems just and proper.

## COUNT SEVEN
### (Accounting)

128.    Plaintiffs repeat all of the allegations contained in the previous paragraphs of this

Complaint as if same were fully set forth herein.

129.    In order to assess the full extent of the harm suffered by Plaintiffs as a result of

the Defendant's fraudulent conduct, it is necessary to obtain a complete accounting for the

disposition of all funds paid by Plaintiffs to the Defendant and Interglobal.

WHEREFORE, Plaintiffs demand judgment against the Defendant as follows:

A.    A complete accounting of the disposition of all sums paid by Plaintiffs to
the Defendant and Interglobal;

B.    Awarding attorneys' fees and costs; and

C.    For such other and further relief as the Court deems just and proper.


FOX ROTHSCHILD LLP

*Attorneys for Marc and Amy Lebovitz*

By:  */s/ Michael R. Herz*
Michael R. Herz

Dated:  July 15, 2020